IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NORTHROP GRUMMAN
SHIP SYSTEMS, INC.,
Plaintiff.,

v.   C.A. No. 1:20-mc-00257-UNA

THE MINISTRY OF DEFENSE OF
THE REPUBLIC OF VENEZUELA,

Defendant.
_____/

# EXPERT REPORT OF MANUEL A. GOMEZ IN SUPPORT OF PLAINTIFF'S MOTION FOR RELIEF UNDER 28 U.S.C. §160(C) AND FOR A WRIT OF ATTACHMENT *FIERI FACIAS*

## I. Qualifications and scope

1. As my credentials state below, I am a Professor of Law and the Associate Dean for Graduate Studies and Global Engagement at Florida International University with expertise on international and comparative law and transnational dispute resolution. My research, teaching and other scholarly endeavors frequently entail a comparison between the U.S. and Latin American jurisdictions, including Venezuela. My familiarity with that country stems from the fact that I have been a Venezuelan lawyer for almost three decades, which has allowed me to amass significant experience both as practitioner and academic. I reside in the United States, but have always remained engaged professionally and academically with Venezuela and routinely work on matters involving Venezuela.

2. I am a lawyer duly licensed to practice law in Venezuela since 1994 and continue to be a good standing member of that bar. I also hold a specialization in Civil Procedure from the Universidad Católica Andrés Bello. I have extensive experience in civil, commercial, labor and family litigation, business transactions, insurance, contracts, and



1

torts in Venezuela. I have also been a professor and researcher affiliated to different Venezuelan law schools. As practitioner and academic, I have acquired significant experience in handling numerous legal matters both in transactional and dispute processing contexts involving Venezuelan and foreign parties. I have also been able to devote significant time and effort to conduct research and publish scholarly works on a broad variety of legal issues involving Venezuela, and other Latin American jurisdictions. I am therefore very familiar with the Venezuelan legal system, including, — but not limited to — government contracts, government regulation, private and public international law, criminal and civil liability, civil and commercial litigation, anti-corruption regulation, the recognition and enforcement of foreign judgments, and international judicial cooperation.

3. I hold two graduate degrees from Stanford University, a master's degree in Law (J.S.M) and a doctorate in juridical science (J.S.D.).

4. In the course of my professional and academic career, I have lectured at many universities, and spoken at numerous professional and academic conferences throughout the Americas, Europe, Africa, Asia and Oceania. A copy of my *curriculum vitae* listing my credentials, affiliations, and a select list of my publications is attached hereto as "Exhibit A".

5. I have been retained by counsel for Northrop Grumman Ship Systems, Inc., f/k/a Ingalls Shipbuilding, Inc., and now known as Huntington Ingalls Incorporated ("Plaintiff" or "Huntington Ingalls") to analyze certain issues regarding Venezuela in support of a writ of attachment *fieri facias* ("*fi.fa.*") as to the shares of PDV Holding, Inc. ("PDVH"), a Delaware corporation fully owned by Petróleos de Venezuela S.A. ("PDVSA"), the state oil company and alter ego of judgment debtor the Bolivarian Republic of Venezuela ("Venezuela").

6. The statements in this report are true and correct to the best of my knowledge. I was not required to conduct an independent review of the facts and circumstances of this case, but just to offer a professional opinion based on my knowledge and familiarity with Venezuela's legal system and its current political reality. My analysis and conclusions are based on (i) my familiarity with the Venezuelan legal system and the current political situation affecting that country; (ii) my analysis of the facts and



circumstances of this case based on the documents that I have reviewed, and (iii) my analysis of the laws and other regulations, government reports, judicial decisions, news articles and academic publications cited throughout this report.

7. I have been asked to address the following specific questions:

    a. Whether PDVSA remains Venezuela's alter ego —as found by this Court in August of 2018— such that PDVSA's assets in the United States are still subject to the pervasive control of Venezuela.

    b. Whether the circumstances of this Court's alter ego analysis regarding PDVSA have changed since the United States' decision in January of 2019 to transfer its recognition of Venezuela's legitimate government from that headed by Mr. Nicolás Maduro to that led by Mr. Juan Guaidó.

8. This report is the independent product of my professional assessment of the issues presented to me insofar they involve the interpretation of Venezuelan law, the work of its legal institutions and the political reality of that country. My opinion is not subject to any external influence, pressure, or interest in the outcome of any dispute —potential or present— between any and all of the parties involved in this matter. The considerations and conclusions expressed in this report embody my professional opinion on the specific matters to which they refer. I am being paid for my services in this matter, but my fees are not dependent on the nature of the opinions I state here, or on the result of the case.

9. For the reasons set forth below, it is my professional opinion that (i) PDVSA remains Venezuela's alter ego and its assets and interests in the United States are still subject to the pervasive control of Venezuela's political leaders, and (ii) the circumstances considered by this Court to regard PDVSA as Venezuela's alter ego have become more pronounced concerning the extensive control exerted by the country's political leaders since the United States' recognition of Mr. Juan Guaidó as Interim President of Venezuela in January of 2019.



## II. Venezuela and PDVSA have become increasingly intermingled during the last two decades

10. PDVSA was originally created in 1975 as a state-owned holding to carry out the government policies regarding the distribution and commercialization of hydrocarbons in Venezuela.[1] Despite having been established as private commercial corporation, and therefore subject to laws and regulations applicable to all commercial firms, PDVSA was also subject to the control and oversight of the Executive branch, through the Ministry of Energy and Mining. The corporate form gave PDVSA some degree of flexibility and operational independence, while at the same time Venezuela as its sole shareholder and beneficiary, was able to maintain certain level of oversight. Given Venezuela's key presence in the global energy market as one of the main producers of oil in the world, holder of the largest reserves, and the fact that the hydrocarbons was the main pillar of the Venezuelan economy; PDVSA's strategic importance to the government became obvious. Nevertheless, at least until the early 2000s, the level of government intervention on PDVSA's operations was limited to what was required under the different statutes and government regulations, and political interference in the holding entities was minimal.

11. 2003 is generally seen as the breaking point in the relationship between Venezuela and PDVSA, and the beginning of a new relationship between the two whereby the former began to erode PDVSA's independence. A nationwide oil strike that paralyzed the industry and the country's economy in February of that year was met with a dramatic decision by then-president Chávez to summarily dismiss around 18,000 PDVSA employees (40% of the company's workforce). Chávez's dramatic announcement was broadcasted on live television and became a symbol for a new era during which PDVSA increasingly became a political instrument of the Chavista government. The positions left vacant by the thousands of dismissed PDVSA employees were quickly filled with political supporters of Chávez's party and only trusted people with proven loyalty to the president —many of whom were former military commanders— were

---

[1] Decree No. 1123 of 30 August 1975, Official Gazzette No. 1770 (Venez.).

Case 1:20-mc-00257-LPS Document 28 Filed 02/19/21 Page 5 of 11 PageID #: 617

appointed to leadership positions in PDVSA, other key entities, and throughout most government agencies.

12. In economic terms, PDVSA became the main financier of government programs and activities —many of which were— unrelated to its main business of commercializing hydrocarbons. As it was later revealed, PDVSA became a slush fund of the Chavista government to finance political campaigns, purchase votes and attain geopolitical prominence around the world through a series of social programs called Bolivarian Missions.[2] The political interference and increasingly excessive control by the government on the operation of PDVSA and its subsidiaries, both in Venezuela and abroad, was justified by a symbolic effort to redistribute the oil wealth among all Venezuelans. This sentiment was captured by the famous slogan "Now, PDVSA belongs to the people" ("*Ahora PDVSA es del pueblo*"), which was intended to mark the difference between an old —independent— PDVSA and a new one totally controlled by the state.[3]

13. The shift toward extensive government control was not limited to PDVSA and its affiliates. It extended to every asset regardless of whether it was located at home or abroad, over which Venezuela had an interest. In many areas, the government effectively erased the distinction between formal and legal institutions and political actors. Many of these transformations required legal changes or reinterpretation of standards and principles, which were accomplished whenever the government had control over the legislative and judicial branches. In other cases, the government simply disregarded any legal limits and carried out its will even if it meant an affront to the rule of law. This situation intensified the disregard for any separation between government owned enterprises such as PDVSA and political operatives. Regular business decisions ordinarily reserved to corporate officers were made by government officials for political ends, and any property belonging to PDVSA was routinely used

---

[2] Manuel A. Gómez, "Malleable Law: The (Mis)Use of Legal Tools in the Pursuit of a Political Agenda" 19(3) ILSA Journal of International and Comparative Law (2013).

[3] Francisco J. Torres, "¡Ahora PDVSA es del Pueblo!", Aporrea, 11 March 2006 <https://www.aporrea.org/energia/a26799.html> last visited: 19 February 2021.

for purposes unrelated to the company's activities. The Maduro administration, which succeeded Chávez since 2013, has continued to openly treat PDVSA and its affiliates as an appendix of the Venezuelan government.

14. On January 23, 2019, Juan Guaidó, the head of Venezuela's legislative branch —the National Assembly— was sworn in as the country's Interim President ("IP") given the constitutional crisis generated by President Maduro's refusal to step down despite de expiration of his term.[4] Guaidó's appointment was based on an interpretation of article 233 of the Constitution, according to which the head of the National Assembly shall hold the presidency on an interim basis while new elections are held, due to a permanent vacancy (*falta absoluta*) in the presidency.[5] In Maduro's view, he was elected president for a second term in late 2018 and his new term began on January 10, 2019. In the eyes of millions of Venezuelans, many foreign governments and international organizations, the 2018 elections were illegitimate in part because opposition parties were disqualified from participating. To this day, Maduro has refused to leave his post and remains a de facto ruler in Venezuela, despite a significant level of international pressure from more than fifty countries that have recognized Guaidó as the legitimate leader of that country.[6] The U.S. was the first nation to recognize Guaidó as IP and has vowed to lend support to his efforts to put pressure on Maduro to step down, so free and fair elections can be held, and the country can regain its institutional stability.[7]

15. Despite such a heavy repudiation from many foreign governments and multilateral organizations, Maduro, and most of the public officials appointed under his mandate, have remained in office and in effective control of the government and the territory.

---

[4] Ana Vanessa Herrero, "Venezuela's Leader, Maduro Cuts Ties", The New York Times, 23 January 2019 < https://www.nytimes.com/2019/01/23/world/americas/venezuela-protests-guaido-maduro.html> last visited: 19 February 2021.

[5] Article 233, Constitution (Venez.).

[6] Congressional Research Service, "Venezuela: Background and U.S. Relations" Updated June 4, 2019 < https://crsreports.congress.gov/product/pdf/R/R44841/19> last visited: 19 February 2021.

[7] U.S. Department of State, "U.S. Relations With Venezuela", 6 July 2020 < https://www.state.gov/u-s-relations-with-venezuela/> last visited: 19 February 2021.

Guaidó, on the other hand, has managed to assemble a team of key appointees, most of whom are not in Venezuela, and have accepted to work ad honorem in critical areas such as foreign affairs, economic development, debt restructuring, asset recovery, legal representation, and the management of government interests in state-owned entities like PDVSA and its affiliates. In August 2019, Guaidó announced the creation of a Government Center (*Centro de Gobierno*, or "CdG") inside the Embassy of the Kingdom of Spain in Caracas, as an institution in charge of coordinating the activities of his interim government.[8]

16. During more than a year, the tension between Guaidó and Maduro has created an unprecedented institutional tug-of-war, with two presidencies, two legislatures[9] and two Supreme Courts.[10] The contest has spilled over to many foreign courts and arbitral tribunals throughout the world where the legal representatives of both sides have claimed the legitimate representation of Venezuela and its instrumentalities. Given the strategic significance and the economic importance of PDVSA and its affiliates to both sides, they have also fought for its control.

17. Despite the mutual challenges levied by Guaidó and Maduro's representatives against each other regarding their democratic legitimacy and right to remain in power, they have at least one thing in common. They both have used their political influence to maintain extensive control over all foreign assets held by Venezuela's owned entities, especially PDVSA and its affiliates, and have not been shy about treating those assets as the direct property of Venezuela. As I now turn to explain, the arrival of Guaidó to



---

[8] Agencia EFE, "Guaidó anuncia la creación de un 'centro de gobierno' con Leopoldo López a cargo", 28 August 2019 < https://www.efe.com/efe/america/politica/guaido-anuncia-la-creacion-de-un-centro-gobierno-con-leopoldo-lopez-a-cargo/20000035-4051908> last visited: 19 February 2021.

[9] On the one hand, the National Assembly, which is the regular legislative power, and a Constituent National Assembly, which was formed by Maduro to bypass the functioning of regular institutions.

[10] The Supreme Tribunal of Justice in Exile was formed in 2017 and inaugurated in the headquarters of the Organization of American States (OAS) in Washington, D.C. https://www.clarin.com/mundo/venezuela-tribunal-supremo-justicia-exilio-instala-oea_0_rJDm2r6h-.html The Court has also been recognized by other countries in the region, including Chile https://www.lapatilla.com/2018/10/04/parlamento-chileno-aprueba-proyecto-que-reconoce-la-legitimidad-del-tsj-venezolano-en-el-exilio/ last visited: 19 February 2021.

the political scenario in early 2019 and the ensuing struggle with the Maduro regime for the control of PDVSA, not only maintained its alter ego condition vis-à-vis Venezuela, but deepened it further.

### III. The intensification of Venezuela's excessive political control of PDVSA and its affiliates since 2019

18. One of the first official acts of Venezuela's National Assembly after swearing in Guaidó as the country's IP was the issuance of an emergency act, on February 5, 2019, dubbed "Statute to Govern the Transition Toward Democracy to Reestablish the Validity of the Constitution of the Bolivarian Republic of Venezuela" ("*Estatuto de Transición*", or "TS").[11] The TS was justified on an extraordinary and unprecedented application of article 333 of the Constitution, which imposes on all citizens the duty to restore the validity of the constitution. Article 34 TS expressly bypassed the ordinary corporate regime of PDVSA by empowering IP Guaidó to appoint a special Board of Directors for that company so it could exercise its rights as PDV Holding's shareholder, including the selection of board members to PDV Holding, Citgo, and other affiliates. Article 34(1) expressly extended the eligibility of PDVSA board members to those living abroad, and article 34(2) further stated that the exceptional legal regime created by the TS would override any other relevant legal provisions of Venezuelan law. It also indicated that any formalities required either by statute or by corporate bylaws, should be interpreted in a manner that favored the representation of PDVSA as sole shareholder of PDV Holding. Soon thereafter, the Maduro-controlled Constitutional Chamber of Venezuela's Supreme Court Tribunal declared the TS null and void for considering it an act contrary to the constitutional order and public international law principles.[12] The legal challenge continued in foreign courts with an action filed in the Court of Chancery of Delaware by six former corporate officers of PDVSA and related



---

[11] Asamblea Nacional de la República Bolivariana de Venezuela, "Estatuto que rige la transición a la democracia para restablecer la vigencia de la Constitución de la República Bolivariana de Venezuela", 5 February 2019.

[12] Constitutional Chamber of the Supreme Justice Tribunal, Decision of 8 February 2019, File No. 17-001, published in the Official Gazette No. 41,583 of 11 February 2019.

entities against those appointed by Guaidó pursuant to the TS.[13] Plaintiffs in that action sought a declaration that they comprised the rightful boards of PDVSA and defendants counterclaimed for a competing declaration. Applying the act of state doctrine and based on the recognition by the U.S. government of Guaidó's investiture as IP of Venezuela, the Court took as valid the reconstitution of PDVSA's board resulting from Guaidó's decision and the TS.[14] Back in Venezuela, Maduro's regime has continued to bring legal challenges against Guaidó's interim government as reflected in a recent decision issued by the Constitutional Chamber of the Supreme Justice Tribunal on 30 December 2020, whereby it declared null and void an amendment to the TS.[15]

19. By virtue of the exceptional legal regime created by the National Assembly through the TS and other formal acts, which legitimacy has been reaffirmed by foreign courts, IP Guaidó and his appointees have been given unfettered authority to exercise considerable control over PDVSA, PDV Holding and Citgo. Further, by subjecting the interpretation and application of this exceptional legal regime to the duty to defend and restore the Constitution under article 333, the National Assembly has effectively removed any potential obstacles that could prevent IP Guaidó from carrying out his mandate to directly control PDVSA's assets and conversely, to shield them from Maduro's reach. Since the latter still holds control over PDVSA's assets in the Venezuelan territory, Guaidó has only been able to exercise his power and make decisions over assets located abroad.

20. On April 2, 2019, The National Assembly issued an "Accord to Expand the Powers Vested and the Number of Ad-Hoc Board Members of PDVSA" ("AtE")[16] that further

---

[13] See, Jimenez v. Palacios, C.A. 2019 Del. Ch. LEXIS 299; 2019 WL 3526479; affirmed on 22 July 2020, 2020 WL 4207625

[14] Id.

[15] Constitutional Chamber of the Supreme Justice Tribunal, Decision of 30 December 2020, Decision 0274-2020.

[16] Asamblea Nacional de la República Bolivariana de Venezuela, "Acuerdo para la ampliación de las facultades otorgadas y el número de miembros de la Junta Administradora Ad-Hoc de Petróleos de Venezuela, S.A. (PDVSA)", 9 April 2019
<https://www.asambleanacionalvenezuela.org/actos/detalle/acuerdo-para-la-ampliacion-de-las-facultades-

expanded Guaidó's control over PDVSA by allowing him to issue a special decree to broaden the authority of PDVSA's board, and by suspending all rights and authorities otherwise vested on the Shareholders' Meeting, the Board of Directors, and the Presidency of PDVSA and its affiliates. The AtE also suspended any functions given to the Minister of Hydrocarbons and any other government official, branch or agency related to PDVSA, which existed by or was given any functions after January 10, 2019, which is when the permanent vacancy of the Maduro presidency occurred.

21. As a way to further sever ties between the Maduro regime and PDVSA, and conversely to subject the company to an extensive control by Guaidó's interim government, article 34(3)(b) TS, prohibited PDV Holding and its affiliates from maintaining any relationship with "those who nowadays usurp the Presidency" (i.e. Maduro) and ordered those entities to withhold any payments or contributions to PDVSA, in order to effectively prevent the Maduro regime from accessing those resources. Until then, PDVSA's revenues were regularly channeled through different funds connected to social programs and other government initiatives.

22. The submission of PDVSA's own assets to the extraordinary control of Guaidó's interim government and their treatment as property of the Venezuelan state (*activos del Estado*) is also reflected in the limitation imposed by article 36 TS, which precludes the use of any funds belonging to PDVSA or any other state-owned entity until after the Maduro regime relinquishes power. Even to be able to carry out an otherwise ordinary business decision such as paying its own legal fees, PDVSA had to obtain express authorization from Guaidó's National Assembly in 2019.[17] Additionally, PDVSA funds have also been directed to be used in the legal defense of Venezuela in foreign and international proceedings.[18]

---

otorgadas-y-el-numero-de-miembros-de-la-junta-administradora-ad-hoc-de-petroleosde-venezuela-sa-pdvsa> last visited: 19 February 2021.

[17] Asamblea Nacional, "Acuerdo que autoriza el uso de recursos de Petróleos de Venezuela, S.A. (PDVSA) para la defensa de sus activos en el extranjero", 1 October 2019 < http://www.asambleanacional.gob.ve/actos/detalle/acuerdo-que-autoriza-el-uso-de-recursos-de-petroleos-de-venezuela-sa-pdvsa-para-la-defensa-de-sus-activos-en-el-extranjero> last visited: 19 February 2021.

[18] Asamblea Nacional, "Acuerdo que autoriza la creación del fondo especial de litigios", 19 November 2019 < http://www.asambleanacional.gob.ve/actos/detalle/acuerdo-que-autoriza-la-creacion-del-fondo-especial-de-litigios> last visited: 19 February 2021.

23. In addition to the aforementioned legal acts, the Guaidó interim government has repeatedly issued public statements declaring that the assets of PDVSA, PDV Holding and Citgo are property of Venezuela and of the Venezuelan people,[19] and that the appointment of special board members of PDVSA and related entities and other measures taken are part of the strategy to preserve the property belonging to all Venezuelans.[20]

24. Based on the aforementioned, it is clear that PDVSA remains Venezuela's alter ego such that PDVSA's assets in the United States are still subject to the pervasive control of Venezuela, and that such control has intensified since the United States' decision in January of 2019 to transfer its recognition of Venezuela's legitimate government from that headed by Mr. Nicolás Maduro to that led by Mr. Juan Guaidó.

I declare under penalty of perjury that the foregoing is true and correct.

19 February 2021

_____
Manuel A. Gómez

---

[19] See, e.g. Centro de Comunicación Nacional, "Gobierno Legítimo: Medidas OFAC garantizan protección de CITGO pese a fallo de la Corte de Delaware", 14 January 2021.

[20] See, e.g. Centro de Comunicación Nacional, "President (e) Guaidó after court ruling on PDVSA 2020 bonds: CITGO remains protected", 17 October 2020.