IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHROP GRUMMAN SHIP SYSTEMS, INC., <br><br> Plaintiff., <br><br> v. <br><br> THE MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA, <br><br> Defendant. | C.A. No. 1:20-mc-00257-LPS |

### REPLY IN SUPPORT OF PLAINTIFF'S AMENDED MOTION FOR RELIEF UNDER 28 U.S.C. § 1610(C) AND FOR A WRIT OF ATTACHMENT *FIERI FACIAS*

<u>OF COUNSEL</u>:

Alexander A. Yanos *pro hac*
Carlos Ramos-Mrosovsky *pro hac*
Rajat Ranna *pro hac*
Robert Poole *pro hac*
ALSTON & BIRD, LLP
90 Park Avenue, 15th Floor
New York, NY 10016-1387
212-210-9400
alex.yanos@alston.com
carlos.ramos-mrosovsky@alston.com
rajat.rana@alston.com
robert.poole@alston.com

Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, Suite 1700
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100
ljones@pszjlaw.com
pkeane@pszjlaw.com

*Attorneys for Plaintiff*

DATED: April 16, 2021

**TABLE OF CONTENTS**

ARGUMENT ........................................................................................................................... 3

I.  The Court Has Subject Matter Jurisdiction Because PDVSA Is Venezuela's Alter Ego. ................................................................................................................... 3

II. Huntington Ingalls Has Proven That PDVSA Is Venezuela's Alter Ego .......................... 3

    A.  Venezuela Directs PDVSA's Affairs ................................................................... 4

    B.  Venezuela exercises economic control over PDVSA. ......................................... 6

    C.  Venezuela Is The Real Beneficiary Of PDVSA's Conduct ................................. 7

    D.  Artificially Distinguishing PDVSA From Venezuela Would Allow Venezuela To Avoid Its Obligations To Creditors. ............................................. 8

III. This Court Has Already Held That Federal Law Controls Its Alter Ego Determination. ................................................................................................................... 8

IV. Huntington Ingalls Seeks Relief Fully Consistent With OFAC License Requirements. .................................................................................................................... 9

V.  A Reasonable Period Time Has Elapsed Under Section 1610(c) Of The FSIA. ............. 10

CONCLUSION ...................................................................................................................... 10

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Biogen Int'l GmbH v. Amneal Pharm. LLC*,
 487 F. Supp. 3d 254 (D. Del. 2020) .................................................................................. 9

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
 932 F.3d 126 (3d Cir. 2019) ...................................................................................... passim

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
 No. 17-mc-151-LPS, 2021 U.S. Dist. LEXIS 7793 (D. Del. Jan. 14, 2021) .......................... 8

*Crystallex Int'l Corp. v. PDV Holding Inc.*,
 No. 15-cv-1082-LPS, 2019 U.S. Dist. LEXIS 214167 (D. Del. Dec. 12, 2019) ..................... 1

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 333 F. Supp. 3d 380, 396
 n.13 (D. Del. 2018) .........................................................................................................8, 9

*Doberstein v. G-P Indus.*,
 No. 9995-VCP, 2015 Del. Ch. LEXIS 275 (Ch. Oct. 30, 2015) ........................................... 9

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
 462 U.S. 611 (1983) .................................................................................................. passim

*Harrison v. Soroof Int'l, Inc.*,
 320 F. Supp. 3d 602 (D. Del. 2018) ................................................................................... 9

*Red Tree Invs., LLC v. Petróleos De Venezuela, S.A.*,
 No. 19-cv-2519 (AJN), 2020 U.S. Dist. LEXIS 6409 (S.D.N.Y. Jan. 14, 2020) .................. 10

**STATUTES**

28 U.S.C. § 1610(c) .............................................................................................................. 10

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 69 .......................................................................................... 9

"Louis Pacheco 'If We Had Not Sued, The Bondholders Would Have Had A
 Party And Taken Citgo," EMBASSY OF BOLIVARIAN REPUBLIC OF VENEZUELA
 (Nov. 17, 2020) ..............................................................................................................5, 6

Presentation of results 2019 – 2020, PDVSA Ad Hoc Board of Directors .............................5, 6

"Venezuela's PDVSA, in default, says total debt remained unchanged in 2019,"
 REUTERS (Jan. 27, 2020) ................................................................................................... 6

"Venezuela Oil & Gas," https://www.venezuelaoilgas.com (last visited April 16, 2021).................................................................................................................................. 7

Second Gómez Report ............................................................................................................... 3

Plaintiff and judgment creditor Northrop Grumman Ship Systems, Inc., f/k/a Ingalls Shipbuilding, Inc., and now known as Huntington Ingalls Incorporated ("Plaintiff" or "Huntington Ingalls"), respectfully submits this reply in support of its amended motion for an order authorizing the Clerk of the Court to issue a writ of attachment *fieri facias*, D.I. 25 (the "Motion").

## INTRODUCTION

Petróleos de Venezuela S.A. ("PDVSA") should answer for the debt owed by the Bolivarian Republic of Venezuela ("Venezuela") to Huntington Ingalls because PDVSA is, in every way, the alter ego of the Venezuelan State. As this Court has held, President Juan Guaidó is the President of Venezuela and, together with the Venezuelan National Assembly, heads its government. *See Crystallex Int'l Corp. v. PDV Holding Inc.*, No. 15-cv-1082-LPS, 2019 U.S. Dist. LEXIS 214167, at *10 n.9 (D. Del. Dec. 12, 2019). At the same time, it is undisputed that Nicolás Maduro and the persons supposedly appointed by him are in open rebellion and continue to exert de facto control over the territory of Venezuela. The principal objective of the Guaidó Government is to quell that rebellion and obtain control over Venezuela's territory. With no armed forces at its disposal, the only tools available to that end are economic duress and moral suasion.

In terms of economic duress, one element, only partially within the control of the Guaidó administration, is the economic sanctions imposed by the US government. The other element is the assertion of control over those parts of PDVSA not found in Venezuela ("Ad hoc PDVSA"). By controlling Ad hoc PDVSA, the Guaidó government: (*i*) gives itself a revenue stream since it has no ordinary tax base stemming from payments made in Venezuela; (*ii*) deprives the Maduro rebellion of access to those same revenues; and (*iii*) retains a vital chess piece in its effort to win physical control over the Venezuelan territories.

1

In this Reply, Huntington Ingalls will demonstrate the statements and actions that evidence the domination of Ad hoc PDVSA by the Guaidó Administration and show how those facts establish that PDVSA is the alter ego of the Venezuelan State under the law applied by this Court. However, over and above specific facts is *realpolitik*. The Ad hoc PDVSA that is governed by the *ad hoc* board that was appointed by Mr. Guaidó's government is inseparable from the recognized Venezuelan State as led by the Guaidó government. Ad hoc PDVSA is that government's only source of power, only source of revenue and, in many ways, the only part of Venezuela actually governed by the Venezuelan State.

As discussed in Professor Gómez's reply report, PDVSA's citations to the formal provisions of the Guaidó administration's laws on transparency miss the point: (*i*) Venezuela has always had such laws—and disregarded them under Chavez and Maduro; (*ii*) those laws have nothing to say about the fact that the Venezuelan National Assembly, transparently, ordered the ad hoc PDVSA to default on its debts; and (*iii*) those laws do not change the fundamental fact that Ad hoc PDVSA is the Guaidó government's only real bargaining chip in its efforts to quell the rebellion and take control of the Venezuelan territories. Thus, whether one looks at the forest or the trees, the Guaidó government and the Ad hoc PDVSA it created are one.

In this case, PDVSA is represented by Curtis Mallet. Curtis also represents Venezuela in other proceedings concerning an arbitration award. *See* Venezuela's Memorandum in Opposition to Summary Judgment, *Koch Minerals Sàrl, et. al. v. Bolivarian Rep. of Venez.*, 1:17-cv-02559-ZMF, D.I. 53 at 1 (Apr. 5, 2021). Even Venezuela's lawyers cannot maintain the distinction between the two entities in their filings, recently stating in a brief submitted on behalf of Venezuela

that, "[b]y submitting this opposition, **PDVSA** does not waive, and expressly preserves, all of its rights and defenses. . . .") (emphasis added). And that is completely understandable.[1]

## ARGUMENT

### I. The Court Has Subject Matter Jurisdiction Because PDVSA Is Venezuela's Alter Ego.

There is no separate issue of subject matter jurisdiction over PDVSA because PDVSA's ability to invoke the immunities of the Foreign Sovereign Immunity Act's ("FSIA") as an "instrumentality" of Venezuela rises and falls with Huntington Ingalls's claim that PDVSA is in fact Venezuela's alter ego. In fact, PDVSA admits that state instrumentalities cannot take advantage of the FSIA protections where a Court finds them the alter ego of a sovereign over which it has jurisdiction. *See* D.I. 32 at 11.

### II. Huntington Ingalls Has Proven That PDVSA Is Venezuela's Alter Ego.

PDVSA goes to great lengths to cite legislation that purports to redefine the relationship between the Venezuelan State and PDVSA. *See*, *e.g.*, D.I. 32 at 16. But as explained in Professor Manuel Gómez's reports, similar aspirational statements could be found in legislation applicable to PDVSA long before Mr. Guaidó became President. *See* Second Gómez Report,[2] ¶¶ 6–7; *see also id*. ¶ 15 ("PDVSA's Ad Hoc Board did not automatically become autonomous, independent and bound to operate guided by 'technical criteria aimed at the efficient management of PDVSA's direct and indirect subsidiaries organized abroad' because article 7 of Guaidó's Decree No. 3 said so."). What matters, under the *Bancec* test applied by this Court, is whether Ad hoc PDVSA "is so extensively controlled by [the Guaidó government] that a relationship of principal and agent is

---

[1] As this court has been advised, Venezuela has not appointed counsel in this proceeding. But that did not stop Venezuela's special attorney from echoing the statements made by Ad hoc PDVSA in a letter to this court filed *before* PDVSA's brief was filed.

[2] "Second Gómez Report" refers to the April 16, 2021, Expert Report of Manuel A. Gomez filed concurrently with this reply memorandum.

3

created." *See Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 932 F.3d 126, 132 (3d Cir. 2019) (quoting *First National City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 629 (1983)). It is. The recognized government of Venezuela maintains complete control over Ad hoc PDVSA such that it is properly deemed Venezuela's alter ego.

### A. Venezuela Directs Ad Hoc PDVSA's Affairs.

The record show that the Venezuelan State exerts no less control over Ad hoc PDVSA under President Guaidó than it did the whole of PDVSA under either the Maduro regime. President Maduro exercised complete dominance over PDVSA despite provisions of Venezuelan law that formally ensured independent governance. *See* Second Gómez Report, ¶¶ 6–7, 22. While the 2018 transition to President Guaidó dramatically changed the Venezuelan State's politics and ideology, it did not end PDVSA's complete subordination to the needs of the state.

The State's control starts with the creation of the *ad hoc* board itself and the extraordinary powers used to do so. President Guaidó, faced with a competing government's claims to Venezuelan assets, immediately orchestrated legislation pursuant to exceptional powers to create the *ad hoc* board ***not*** to establish distance between PDVSA and his administration, but rather for the sole purpose of holding PDVSA's assets in PDVH *close*—away from the Maduro regime. *See* Second Gómez Report, ¶¶ 9–10; Second Yanos Decl., Ex. 12 ("Guaidó concluded by saying that part of the struggle to liberate Venezuela involves taking powers away from the dictatorship."); Second Yanos Decl., Ex. 14 (appointment of the *ad hoc* board "is part of 'taking progressive and orderly control of the assets of [Venezuela] abroad' to 'speed up the political transition.'"). In fact, the Transition Statute upon which PDVSA relies to evidence its independence shows the very opposite. Article 34(1)(b) expressly "prohibits PDV Holding and its subsidiaries from having 'any relationship' with the Maduro regime and from making any payment or patrimonial contribution to PDVSA is obviously a political order." Second Gómez Report, ¶ 17.

4

No events subsequent to the creation of the *ad hoc* board truly distanced PDVSA from Venezuela's control. The evidence is instead that Ad hoc PDVSA is a mechanism for exercising President Guaidó's control over assets of the Venezuelan State. *See* Second Yanos Decl., Ex. 16 at 30 n. 84 (PDVSA brief admitting that "[t]here is no dispute that PDVSA and PDVSA Petróleo, which are 'attached' to (and thus controlled by) Venezuela's Ministry of Petroleum and Mining, are part of the National Public Administration of the Venezuelan Republic"). As Huntington Ingalls' has shown, Venezuelan government officials and PDVSA officers regularly refer to PDVSA as "assets of the Venezuelan state." *See* D.I. 26 at 11–12. The Guaidó administration has thus focused entirely on shielding these assets from the remnant Maduro regime, going so far as to intervene in legal proceedings to invalidate PDVSA's debt. Indeed, prior to those proceedings, the Interim Government directed PDVSA not to pay its debts. *See* Presentation of results 2019 – 2020, PDVSA Ad Hoc Board of Directors, at 12 ("Third Yanos Decl.,[3] Ex. 2"); Second Gómez Report, ¶ 25. In an interview, Luis Pacheco, the then-Chairman of the *ad hoc* PDVSA board acknowledged PDVSA's subservience to Venezuela's direction, stating that "PDVSA's obligation [in the bond proceedings] was to support what the National Assembly, the only legitimately elected body in Venezuela, determined."[4] Such an understanding of Ad Hoc PDVSA's role is irreconcilable with PDVSA's legal position here that Venezuela merely exercises its rights as a shareholder in the course of ordinary corporate governance. No shareholder vote was taken to dismiss PDVSA's debt. Instead the legislature simply gave Ad hoc PDVSA an order.

---

[3] Citations to "Third Yanos Decl." refer to the April 16, 2021, Declaration of Alexander A. Yanos in Support of Plaintiff's Amended Motion for Writ of Attachment *Fierie Facias* Reply Brief, along with its attached exhibits, filed concurrently with this brief.

[4] *See* "Luis Pacheco: 'If we had not sued, the bondholders would have had a party and taken Citgo,'" EMBASSY OF BOLIVARIAN REPUBLIC OF VENEZUELA, at 3–4 (Nov. 17, 2020) ("Third Yanos Decl., Ex. 4").

Moreover, while PDVSA purports to stress its observance of corporate formalities, it is in fact the *lack* of formalities that is most probative. Ad hoc PDVSA maintains no physical office space. *See* Second Gómez Report, ¶ 25. Its current website is hardly more than a shell.[5] And PDVSA's *ad hoc* board is uncompensated, *see* Second Yanos Decl., Ex. 18 at 3, working solely for the "satisfaction of contributing to the *rebuilding of the country*" and "the main objective" of "return[ing] democracy to Venezuela." Third Yanos Decl., Ex. 4 at 7 (emphasis added).

Other than hand-picked board members, PDVSA has yet to hire employees to operate a presence inside Venezuela itself. *See* Second Gómez Report, ¶ 25. Furthermore, when it is not reporting to the Venezuelan government itself, *see* D.I. 26 at 11, PDVSA remains shrouded in secrecy. Since 2017, PDVSA has failed to disclose a complete annual report—a fact that has not changed since the implementation of the *ad hoc* board.[6] *S*imply put, PDVSA in its current form operates purely to advance the agenda of the Interim Government and President Guaidó's goal of preserving assets for future political deployment.

### B. Venezuela Exercises Economic Control Over PDVSA.

President Guaidó's control of Ad hoc PDVSA is best evidenced by the fact that Ad hoc PDVSA only paid its debts in May 2019 after the Guaidó government authorized such payments and then, in October 2019, Ad hoc PDVSA stopped paying its debts on instructions from the National Assembly. Third Yanos Decl., Ex. 2 at 12; Third Yanos Decl., Ex. 4 at 3–4.

---

[5] *See generally* PDVSA, The Ad Hoc Administrative Board of Petróleos de Venezuela, S.A., http://pdvsa-adhoc.com/ (last visited April 16, 2021).

[6] *See* "Venezuela's PDVSA, in default, says total debt remained unchanged in 2019," REUTERS (Jan. 27, 2020) ("Third Yanos Decl., Ex. 5") ("The company, which has not published a complete annual report since 2017, did not detail other obligations, such as pending debt to providers, an issue that has contributed to declining output in recent years.").

6

Further, it bears noting that it was not strictly necessary for President Guaidó to replace the board of PDVSA to be recognized as president of Venezuela. Nonetheless, the appointment of the *ad hoc* board constitutes one of President Guaidó's *first* acts justified by extraordinary authority. D.I. 28, ¶ 18 ("First Gómez Report"). Clearly, to establish control over PDVSA was to assert control on a portion of **Venezuela's** assets as a tool for governing. It is apparent that the recognized government's goal was to establish its legitimacy by prizing CITGO from the control of Maduro's remnant regime. *See* Second Gómez Report, ¶¶ 9–10. Repeated public statements have consistently evidenced Venezuela's economic mission in reclaiming PDVSA from the remnants of a former administration. *See* D.I. 26 at 11–13 (collecting statements on Venezuela's view of PDVSA); First Gómez Report, ¶ 23. Furthermore, Citgo is sponsoring a private summit closed to the press, placing National Assembly members and PDVSA executives on panels and promising "B2B meetings with [Venezuelan] Government to discuss the future plans for the development of the oil and gas industry in Venezuela." Venezuela Oil & Gas at 11 ("Third Yanos Decl., Ex. 6"). All of this evinces a degree of control ample to qualify PDVSA as Venezuela's alter ego. *See Crystallex*, 932 F.3d at 147 (noting that "Venezuela exercises its economic control over PDVSA by dictating to whom PDVSA must sell oil to and at what price.").

      **C.    Venezuela Is The Real Beneficiary Of PDVSA's Conduct.**

The third and fourth *Bancec* factors have remained unchanged since this Court's 2018 finding. Venezuela remains "PDVSA's lone shareholder" and, as such, "all profit ultimately runs to the Venezuelan government." *Crystallex*, 932 F.3d at 148. It is PDVSA funds that Venezuela relies upon to pay for legal defenses and international proceedings. First Gómez Report, ¶ 22. Furthermore, PDVSA and Venezuela have both been transparent that control of PDVSA is crucial to the political legitimacy of the Guaidó government. *See* Second Yanos Decl., Ex. 12 (describing CITGO as "one of the most valuable assets of the nation."); Second Yanos Decl., Ex. 16 at 31

7

(PDVSA describing CITGO as the "'crown jewel' and most economically and strategically important foreign asset of national [Venezuelan] public interest.").

### D. Artificially Distinguishing PDVSA From Venezuela Would Allow Venezuela To Avoid Its Obligations To Creditors.

As the Third Circuit has held, "[a]ny outcome where [a judgment creditor] is not paid means that Venezuela has avoided its obligations." *Crystallex*, 932 F.3d at 149. Furthermore, "[i]t is likewise clear from the record that PDVSA, and by extension Venezuela, derives significant benefits from the U.S. judicial system" as it continues to litigate payment of its 2020 bonds. *Id.* Indeed, it is in the U.S. Legal system that Venezuela has directed PDVSA's actions most directly. The record shows that the Guaidó administration acts through PDVSA with the singular goal to receive the benefit of evading payment to Huntington Ingalls, while seeking the United States legal system's protection of assets to leverage as a bargaining chip against the Maduro regime.

## III. This Court Has Already Held That Federal Law Controls Its Alter Ego Determination.

Delaware law does not control the Court's alter ego analysis: federal common law does, as this Court has held and the Third Circuit affirmed. *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 333 F. Supp. 3d 380, 396 n.13 (D. Del. 2018) ("[I]t is federal law, not state law, that applies."); *Crystallex*, 932 F.3d at 152 ("The District Court acted within its jurisdiction when it issued a writ of attachment on PDVSA's shares of PDVH to satisfy Crystallex's judgment against Venezuela, and the PDVH shares are not immune from attachment. Thus we affirm."). As the Court is aware, PDVSA already raised and lost on this precise issue in the *Crystallex* proceedings:

> [B]oth parties and the Court did allude to Delaware law in the earlier part of this litigation . . . In rejecting these arguments, the Court considered "cases applying state-law alter ego standards" but found them "unpersuasive" and "unhelpful."

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, No. 17-mc-151-LPS, 2021 U.S. Dist. LEXIS 7793, at *29 n.7 (D. Del. Jan. 14, 2021) (quoting *Crystallex*, 333 F. Supp. 3d at 387-388,

396 n.13, 405, 425 n.48). The same must be true here. *See Biogen Int'l GmbH v. Amneal Pharm. LLC*, 487 F. Supp. 3d 254 (D. Del. 2020) (asking whether "(1) the identical issue was previously adjudicated, (2) that issue was actually litigated, (3) the previous determination was necessary to the decision and (4) the party being precluded from relitigating the issue was fully represented in the prior action."). No change in circumstances mandates a different approach to this pure question of law.[7] It is simply a matter of Third Circuit precedent.[8]

## IV. Huntington Ingalls Seeks Relief Fully Consistent With OFAC License Requirements.

It is undisputed that actually attaching Venezuela's property in the form of the PDVH Shares in this District will require two authorizations from two co-equal branches of government: (*i*) an order form this Court; and (*ii*) a license from OFAC. Huntington Ingalls has informed the Court that it has "applied to OFAC for a license authorizing its attachment of PDVH shares and will keep the Court advised its status." D.I. 26 at 18. But this Court's issuance of an Order *authorizing* an attachment is not subject to OFAC regulations—rather, it is the actual "creation or perfection" of an attachment that requires licensing. *Id.*; Second Yanos Decl. Ex. 19 at 35. Thus, that Huntington Ingalls needs an OFAC license to serve a writ issued by this Court—actually to

---

[7] Even if the Third Circuit had not already upheld this Court's application of federal law to PDVSA's alter ego status, Rule 69 does not require the Court to apply Delaware law. PDVSA erroneously elides the distinction between substantive law and procedure. Fed. R. Civ. P. 69(a) ("The procedure on execution . . . must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."). Huntington Ingalls is abiding by Delaware's attachment procedure. But whether an instrumentality of a foreign state may be considered its alter ego is a question of federal ***substantive*** law. *See Bancec,* 462 U.S. at 622–23.

[8] Even if Delaware law applied, the result would be the same. Delaware law allows an alter ego finding in the presence not only of fraud, but also of "unfairness" and "similar injustice." *See Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 619 (D. Del. 2018); *Doberstein v. G-P Indus.*, No. 9995-VCP, 2015 Del. Ch. LEXIS 275, at *12 (Ch. Oct. 30, 2015). Here, Huntington Ingalls's attachment of PDVH shares would avoid the injustice of allowing Venezuela to avoid its debts while enjoying the benefits of those shares through its pervasive control of PDVSA. *See Crystallex Int'l Corp.*, 333 F. Supp. 3d at 397 n.15; *Crystallex*, 932 F.3d at 149 ("Any outcome where [a judgment creditor] is not paid means that Venezuela has avoided its obligations.").

9

attach Venezuelan property—does not prevent the Court from moving authorizing an attachment. By contrast, PDVSA's argument, if accepted, raises separation of powers concerns: it is Huntington Ingalls that needs a license from OFAC—not the Court. An order authorizing Huntington Ingalls to attach property of Venezuela's alter ego may, in any case, be relevant to OFAC's decision. The Court need not be paralyzed by PDVSA's chicken-and-egg dilemma.

## V.  A Reasonable Period Time Has Elapsed Under Section 1610(c) Of The FSIA.

A "reasonable period of time" has elapsed since the Mississippi federal district court's June 4, 2020, entry of Judgment confirming the Award without the least indication from Venezuela of any intent to honor the Judgment. Venezuela's political instability is not to the contrary. For example, in *OI European Group B.V. v. Bolivarian Republic of Venezuela*, the court noted that "the ***political uncertainty in Venezuela is also a circumstance that bolsters plaintiff's argument that it should be allowed to seek attachment***." 419 F. Supp. 3d at 54–55 (emphasis added).[9]

## CONCLUSION

For the above reasons, and those stated in its opening memorandum, D.I. 26, Huntington Ingalls respectfully requests that this Court enter an order (1) finding that a reasonable period of time has elapsed since judgment was entered allowing a writ of attachment pursuant to 28 U.S.C. § 1610(c); and (2) entitling Huntington Ingalls to a writ of attachment *fieri facias* contingent upon OFAC's grant of a license.

DATED: April 16, 2021                                        Respectfully submitted:

---

[9] *See also Red Tree Invs., LLC v. Petróleos De Venezuela, S.A.*, No. 19-cv-2519 (AJN), 2020 U.S. Dist. LEXIS 6409, at *8, (S.D.N.Y. Jan. 14, 2020) ("'it would not be appropriate or fair to the plaintiff to stay [this] case indefinitely until . . . transition [to the Guaidó government] is completed.'") (quoting *OIEG*, 419 F. Supp. 3d 51 at 56).

|  |  |
|---|---|
| OF COUNSEL:<br>Alexander A. Yanos *pro hac vice*<br>Carlos Ramos-Mrosovsky *pro hac vice*<br>Rajat Ranna *pro hac vice*<br>Robert Poole *pro hac vice*<br>ALSTON & BIRD, LLP<br>90 Park Avenue, 15th Floor<br>New York, NY 10016-1387<br>212-210-9400<br>alex.yanos@alston.com<br>carlos.ramos-mrosovsky@alston.com<br>rajat.rana@alston.com<br>robert.poole@alston.com | */s/* Laura Davis Jones _____<br>Laura Davis Jones (DE Bar No. 2436)<br>Peter J. Keane (DE Bar No. 5503)<br>Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street, Suite 1700<br>P.O. Box 8705<br>Wilmington, DE 19899-8705<br>(302) 652-4100<br>ljones@pszjlaw.com<br>pkeane@pszjlaw.com<br><br>*Attorneys for Plaintiff* |

11