**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

NORTHROP GRUMMAN
SHIP SYSTEMS, INC.,
Plaintiff.,

v.                                                    **C.A. No. 1:20-mc-00257-UNA**

THE MINISTRY OF DEFENSE OF
THE REPUBLIC OF VENEZUELA,

Defendant.

_____/

**EXPERT REPORT OF MANUEL A. GOMEZ IN SUPPORT OF NORTHROP GRUMMAN SHIP SYSTEMS, INC.'S REPLY TO PETROLEOS DE VENEZUELA, S.A.'S CROSS-MOTION TO DISMISS FOR LACK OF JURISDICTION AND IN OPPOSITION OF PLAINTIFF'S AMENDED MOTION FOR A WRIT OF ATTACHMENT _FIERI FACIAS_**

## I.     Scope of this report

1.  Counsel for Northrop Grumman Ship Systems, Inc., f/k/a Ingalls Shipbuilding, Inc., and now known as Huntington Ingalls Incorporated ("Plaintiff" or "Huntington Ingalls") has instructed me to prepare this report in response to Petróleos de Venezuela, S.A.'s ("PDVSA") Memorandum of Law in Support of its Cross-Motion to Dismiss for Lack of Jurisdiction and in Opposition to Huntington Ingalls' Amended Motion for a Writ of Attachment _Fieri Facias_.

2.  I write this report to reiterate my original position regarding PDVSA's lack of independence from Venezuela, and to refute the interpretations of my February 19, 2021 report ("Gómez Report #1") by PDVSA and its experts Allan R. Brewer-Carías and Francisco Medina Herrera.  Nothing in their opinions modifies my prior assessment about the relationship between PDVSA and the Bolivarian Republic of Venezuela ("Venezuela").  In preparing this report, I have examined the following documents:

1

     a.  Memorandum of Law in Support of its Cross-Motion to Dismiss for Lack of Jurisdiction and in Opposition to Northrop Grumman Ship Systems, Inc.'s Amended Motion for a Writ of Attachment *Fieri Facias*, filed on April 2, 2021 as document 32 ("PDVSA's Opposition Memo").

     b.  Expert Declaration of Allan R. Brewer-Carías filed on April 2, 2021 as document 33 ("Brewer Declaration").

     c.  Declaration of Kevin A. Meehan filed on April 2, 2021 as document 34 ("Meehan Declaration").

     d.  Declaration of Horacio Francisco Medina Herrera filed on April 2, 2021 as document 35 ("Medina Declaration").

3.  This report is also the independent product of my professional assessment about the issues presented to me regarding the relationship between Venezuela and PDVSA. My opinions stated here are not subject to any external influence, pressure, or interest in the outcome of any dispute —potential or present— between any and all of the parties involved in this matter. The considerations and conclusions expressed in this report embody my professional opinion on the specific matters to which they refer. I am being paid for my services in this matter, but my fees are not dependent on the nature of the opinions I state here, or on the result of the case.

4.  For the reasons set forth below, it is my professional opinion that none of the interpretations offered by PDVSA through its counsel and experts affect my conclusions that PDVSA is Venezuela's alter ego and its assets and interests in the United States are subject to the pervasive control of Venezuela. Regardless of whether it is Maduro or Guaidó, the Venezuelan government treats PDVSA and Venezuela's assets as one and the same, which has undermined the independence of the former.

## II.    The lack of separateness between Venezuela and PDVSA is independent from the democratic legitimacy or any other characterization of Guaidó's and Maduro's governments.

5.  As I understand, the inquiry here is not focused on whether Maduro is illegitimate, undemocratic, or bad for the Venezuelan people; or if on the contrary, Guaidó is legitimate, democratic, and good for the country. The task is not to render a value

judgment about democratic legitimacy, government recognition or to restate the black letter law of Venezuela's transition statute without considering the reality to which it applies. If there is one thing that Venezuela's situation has proved to the rest of the world is that the *law in the books* can be completely disconnected from the *law in action*. This is a real tragedy for the country but cannot become a blanket shield for Venezuela's legal liabilities abroad. Venezuela's law in the books *has always appeared to be* sophisticated, modern, and adequate, but it has palpably fallen victim of political actors from all sides. Whether those influencing the law have good or bad intentions is beside the point here.

6. As I briefly explained in my earlier report[1] and the Brewer Declaration conceded,[2] for decades, Venezuela's legal framework has established a series of formal controls, administrative and legal procedures and checks and balances that, if applied, would ensure a proper level of separateness between Venezuela and its instrumentalities, including PDVSA. It is uncontroverted that Maduro and his predecessor government led by the late Hugo Chávez chose to ignore many of those formal controls and manipulated institutions to the point that the lines between Venezuela and many of its instrumentalities, including PDVSA, got completely erased.

7. Nonetheless, as Maduro has exercised complete control over all branches of government, not all procedures need to be ignored or bypassed. Certain formalities are followed, ministers and other officials are routinely appointed, budgets are formally approved and so on. Nevertheless, since most —if not all— institutions are compromised and government agencies continue to be in the hands of trusted political operatives, many institutional lines are blurred, and most controls are reduced to a rubber stamp. Unashamedly, law and legal institutions have become instruments in the hands of an ambitious regime that turned increasingly undemocratic. Such dramatic situation is what led to Guaidó's political rising about two and a half years ago.

---

[1] See, Gómez Report #1 at ¶10.

[2] See, Brewer Declaration at ¶¶20-22.

8. Notwithstanding an enormous amount of international pressure, Maduro still effectively controls most of the country and PDVSA, with the obvious exception of the foreign assets that Guaidó's interim government controls.  Guaidó's promise to return Venezuela back to democracy and the rule of law garnered support both domestically and abroad, especially after the world became increasingly desperate to help resolve the crisis.  As Guaidó's interim government was installed in early 2019 and its first official acts were issued, it became immediately apparent that one of its key targets was to obtain control of PDVSA's assets abroad at all costs as a bargaining chip to force Maduro out.  The relationship between Venezuela and PDVSA became the special focus of Guaidó's interim government, which symbolically vowed to restore the functional autonomy of PDV Holding and related entities,[3] but in reality, maintained a tight grip on them to avoid any actions that would weaken the interim government's negotiating position and attempted to remove any obstacles that might have allowed Maduro to regain control over them.[4]

9. Guaidó's political mission has been widely perceived as legitimate and his efforts to restore democracy in that country have been celebrated both at home and abroad.  Since its early days, his interim government turned to PDVSA's assets abroad and made them a political bargaining chip to force Maduro out of power and counteract his sweeping control of Venezuela.  Maduro was debilitated but did not fall and Guaidó began losing momentum.[5]  Notwithstanding an initial enthusiastic endorsement and strong support shown by many nations in favor of Guaidó's cause, the unexpected protraction of his interim government and the controversial extension of his original mandate, have made

---

[3] TS, articles 15(a) and 34.

[4] As a way to streamline the recovery process of PDVSA's foreign assets and eliminate any potential obstacles that might arise from the application of any ordinary Venezuelan legal provisions, article 34(2) TS expressly stated that the provisions contained therein regarding PDVSA and its affiliates would prevail over any other applicable rules and would guide the interpretation of any other legal formalities required by the Venezuelan legal order and the corporate documents" ("*La presente disposición transitoria prelavecerá sobre cualesquiera otras normas aplicables y orientará la interpretación de cualesquiera otras formalidades requeridas en el ordenamiento jurídico venezolano y en los documentos corporativos…*").

[5] Stephen Gibbs, "Venezuela's Nicolás Maduro strengthens grip as Juan Guaidó loses foreign support", The Times, 7 January 2021. Available at: https://www.thetimes.co.uk/article/venezuela-president-maduro-foreign-support-rival-juan-guaido-dnzzg688d (last visited, 16 April 2021).

it difficult for Guaidó to maintain his legitimacy.[6]  Faced with an eroding support both domestically and abroad, Guaidó has struggled to hold onto an economically significant slice of PDVSA's foreign assets, which is perhaps his only leverage against Maduro today.

10. This reality should help explain Guaidó's efforts to maintain a tight grip on PDVSA's foreign property and interests.  Given the high stakes involved in the battle for the political control of Venezuela and the significant economic importance of PDVSA to both sides, it would be naïve to assume that the foreign assets held by PDV Holding, Citgo and other related entities are not at the heart of the political tug-of-war that exists between Maduro and Guaidó.  The corporate conglomerate is *the* key bargaining chip for Guaidó, and his interim government has done everything in its power to keep it that way.

11. Guaidó's interim government resulted from the temporary amalgamation of two branches of government (legislative and executive) whereby Guaidó, as President of the National Assembly also became Guaidó, the Interim President of the Republic, due to Maduro's refusal to leave his post.  Even though justified by exceptional circumstances, the fact is that the separation of powers in Venezuela is far from operating normally.  The practical effect of such distorted reality is that the check to Guaidó's conduct as Interim President might end up in the hands of Guaidó himself as President of the National Assembly.  While it is true that the National Assembly is a corporate body with its own rules and formal protocols that might hypothetically serve as a counterbalance to the attempt by an individual to exert pressure and amass power, Guaidó's clout is not to be discounted — as underscored by the fact that Mr. Guaidó continues to maintain that he has dual roles even though he is formally no longer the President of the National Assembly and, as a result, in the eyes of some, no longer formally entitled to claim the title of Interim President.

12. As I now turn to explain, Guaidó's Interim Government has not relied on the traditional checks and balances and regulatory layers available under Venezuelan law to handle

---

[6] Antonio María Delgado, "As Maduro's grip on Venezuela tightens, Guaidó's support abroad shows signs of fracturing", The Miami Herald, 6 January 2021. Available at: https://www.miamiherald.com/news/nation-world/world/americas/article248296290.html (Last visited, 16 April 2021).

the state's relationship with PDVSA's interests abroad.  The Interim Government has opted instead for enacting a set of relatively simple but unprecedented sweeping emergency regulations that have had the practical effect of intensifying the political grip over PDVSA's foreign assets and have helped erode any vestiges of independence that might have existed.  As a result, and perhaps unfortunately for the Venezuelan people, PDVSA has lost all its individuality and become inseparable from the State.

III.     **The Transition Statute and other Guaidó-issued extraordinary regulations lack the procedures, accountability and other checks and balances that govern the ordinary relationship between the state and its instrumentalities in Venezuela, therefore enabling Venezuela to use PDVSA as its own, deprive it from its independence, and making it act on behalf of Venezuela.**

13. The Transition Statute ("TS" or "*Estatuto de Transición*" in Spanish) and other officials acts issued by Guaidó's interim government created a special regime to handle PDVSA's foreign assets and vowed to confirm its independence, transparency, and accountability, but that did not —and could not— provoke any material changes to the relationship between Venezuela and PDVSA.  Contrary to what Professor Brewer and Chairman Medina seem to suggest, real separateness and independence of a government instrumentality does not stem from the mere passage of formal legal provisions but from conduct that honors such legislation and from the context in which the state and its instrumentality operate.

14. Both the Brewer Declaration and the Medina Declaration give the TS and other regulations enacted by Guaidó an effect that I do not think they have.  The Brewer Declaration states that the "binding decisions adopted by both the National Assembly and Interim President Juan Guaidó since January 2019 [show that] there is currently a clear corporate separation between the Interim Government and PDVSA"[7] and that "The Democracy Transition Statute began the process of restoring PDVSA's independence".[8]     Similarly, the Medina Declaration states that "the ad hoc

---

[7] Brewer Declaration at ¶15.

[8] Brewer Declaration at ¶28.

6

administrative board also has safeguarded the independence of PDV Holding and its subsidiaries from political control and from day-to-day operational control by the Interim Government".[9]

15. I disagree with the characterization that the TS and other Guaidó-issued regulations provoked a material change in the relationship between PDVSA and Venezuela by virtue of their mere existence.  The country did not —and could not— return to democracy just because article 1 TS said that its goal was to "establish a legal framework to govern a democratic transition in the Bolivarian Republic of Venezuela".[10]  Similarly, PDVSA's ad hoc board did not automatically become autonomous, independent and bound to operate guided by "technical criteria aimed at the efficient management of PDVSA's direct and indirect subsidiaries organized abroad"[11] because article 7 of Guaidó's Decree No. 3 said so.  The fact is that those statements have not effected any change regarding the relationship between PDVSA and Venezuela.

16. Even though the TS expressly mentions the interim government's desire to return to democracy, its practical goal was not to create filters, layers or counterbalances, but instead to streamline and simplify Guaidó's operational capacity and conversely thwart Maduro's influence.  The Brewer Declaration lists several provisions of the TS (i.e., articles 4, 11, 15, 34) as examples of the interim government's process to restore PDVSA's independence,[12] but has fallen short of showing how the formal obligations listed in each of those provisions have been able to effectively revert the status quo ex ante regarding the PDVSA foreign entities since Guaidó gained control over them.  For example, a legal provision declaring that the TS is "mandatory for all authorities and public officials, as well as individuals" (Article 4 TS), does not advance the argument of PDVSA is independent from Venezuela.

---

[9] Medina Declaration at ¶12.

[10] Brewer Declaration at ¶ 29.

[11] Brewer Declaration at ¶¶ 16, 40-42.

[12] Brewer Declaration at ¶¶ 29-35.

17. On the other hand, the language of at least one of the key provisions of the TS regarding PDVSA and PDV Holding —article 34— can be read as having paved the way for the interim government to maintain a grip on the PDVSA entities and use them as bargaining chips against Maduro, instead of allowing those entities to act as independent commercial entities like the Brewer Declaration and the Medina Declaration propose.[13]  An express provision that prohibits PDV Holding and its subsidiaries from having "any relationship"; with the Maduro regime and from making any payment or patrimonial contribution to PDVSA is obviously a political order.[14]  If a company/instrumentality is to be left alone and guaranteed to operate independently from its shareholder's direct influence, imposing such a blanket restriction (i.e. no relationship with PDVSA whatsoever) seems counter to any notion of operational and commercial autonomy.  Even if the members of Guaidó's ad hoc board needed to obtain information that they deemed strategically important to the operation of the company, the TS would not allow them to seek it.

18. The Brewer Declaration takes issue with my interpretation of articles 34(3) and 36 TS and states that the directions given there by Venezuela as a shareholder of PDVSA and PDV Holding and its affiliates, "is a completely proper exercise of shareholder power and is not 'extensive control' of the operations of the company".[15]  Whereas it is true that as a general matter of Venezuelan law a shareholder has rights over the direction of the corporation; in this particular context, the shareholder is not any private party but a state that is clearly directing the corporation to serve as its political tool.  Maduro is not just any "improper claimant" as the Brewer Declaration suggests, but more significantly Guaidó's political nemesis.

19. It is also worth noting that even the former head of PDVSA's ad hoc board, Luis Pacheco, has admitted in an interview that settlement with bondholders suing over PDVSA's default on its 2020 bonds in October 2019 are circumscribed by limitations

---

[13] Brewer Declaration at ¶34, Medina Declaration at ¶10.

[14] TS, article 34(1)(b)

[15] Brewer Declaration at p. 15, footnote 25.

placed on the PDVSA ad hoc board by the Guaidó legislature in the TS — not in the context of a shareholder vote.[16]

20. In the same interview, Mr. Pacheco characterized the decision to default on PDVSA's bond as a political decision taken by the legislature, not PDVSA, as directed at the interim government's efforts to wrestle control of the Venezuelan territory from Maduro.[17]

21. Regardless of how many formal statements vowing for independence and transparency were included in the TS and other official acts of Guaidó's interim government, the clear goal of those same regulations and the institutions they depend on is to keep PDVSA's foreign assets from Maduro's grip, and the only way how Guaidó has been able to do so is by keeping those assets tightly controlled.  The emergency regulations passed by Guaidó's interim government and the National Assembly that he controls have served as a shortcut, a bypass to skip any obstacles stemming from Venezuela's preexistent legal framework, which observance might pose an obstacle to the interim government's political ends.  Guaidó's main goal is to thwart Maduro's authority and hopefully force him out, and not necessarily to respect formalities, transparency, and regular procedures.

22. The political legitimacy of the interim government or the constitutional justification for Guaidó's authority does not change the impact of their actions in contributing to dilute any meaningful separation between PDVSA's foreign assets and Venezuela.  Guaidó's interim government may consider that bypassing the regular controls set forth by Venezuelan law was justified by the political end of removing Maduro, but by doing

---

[16] Alejandro Hernández, "Si no hubiésemos demandado los bonistas habrían hecho una fiesta y tomado Citgo", interview with Luis Pacheco, Chairman of the ad hoc board of PDVSA, La Gran Aldea, 16 November 2020. Available at: https://us.embajadavenezuela.org/noticias/luis-pacheco-si-no-hubiesemos-demandado-los-bonistas-habrian-hecho-una-fiesta-y-tomado-citgo/ (Last visited, 16 April 2021).

[17] *Id.* "*Qué tan atada estaba la estrategia de la defensa de activos en el exterior al llamado 'cese de la usurpación'? Las decisiones se tomaron en un contexto donde se pensaba que el cambio político llegaría en poco tiempo. Una de las premisas en mi mente era que con el 'cese de la usurpación' íbamos a tener una posición mucho más fuerte a la hora de negociar cualquiera de las deudas.* ("How tied was the strategy of defending assets abroad to the so-called "cessation of usurpation"? -The decisions were made in a context where it was thought that political change would come in a short time.  One of the premises in my mind was that with the "cessation of usurpation" we were going to have a much stronger position when it came to negotiating any of the debts.).

so they have also contributed to erode any line that might have separated PDVSA from Venezuela an any vestige of independence by the former.

23. Guaidó's provisional government has been functioning during more than two years and has not been able to fulfil its promise to return the rule of law to Venezuela. Thus, in the case of PDVSA's foreign assets, the conduct of Guaidó's interim government has revealed nothing less than a sweeping control over the energy conglomerate due to political exigencies. A custom-made exceptional legal regime headed by the TS has removed any potential obstacles that might stand in the way between Guaidó's control over PDVSA's foreign interests.

24. The very limited regulations enacted by Guaidó's controlled National Assembly as an effort to get rid of Maduro and shift Venezuela back to democracy cannot replace —or even compare with— the system of formal controls that has existed in that country since the creation of PDVSA back in the 1970s, and which would ensure a proper separation between PDVSA (or any other instrumentality) and Venezuela. The problem with Maduro and his predecessor Chávez is that they deliberately chose to bypass most formal legal processes and control mechanisms, thus making PDVSA an extension of the state and blurring the separateness between them. The problem with Guaidó is somewhat different because the National Assembly that he directs created an exceptional legal regime around his mandate. Nevertheless, Guaidó and the interim government have behaved in a manner that leads to a similar outcome regarding the separateness —or lack thereof— between PDVSA and Venezuela.

25. By way of example, in terms of financial control, PDVSA elected to make payments on its 2020 bonds in May of 2019 and default on those same payments in October of 2019 based on orders from the National Assembly.[18] At the same time, the PDVSA ad

---

[18]Junta Administradora Ad Hoc de PDVSA, News, ("The ad hoc administrative board of Petróleos de Venezuela, S.A. announces that the National Assembly of the Bolivarian Republic of Venezuela has authorized the payment of interest on the PDVSA 2020 bond" CARACAS, VENEZUELA, Thursday, May 9, 2019) Available at: http://pdvsa-adhoc.com/en/news/ (Last visited, 16 April 2021); Id., "Presentación de Resultados 2019-2020" (PDVSA defaults on 2020 bonds pursuant to decision of the National Assembly). Available at: http://pdvsa-adhoc.com/en/our-mission/ (Last visited, 16 April 2021).

hoc board has no physical presence in Venezuela and has not hired any employees there either.[19]

26. Ultimately, Guaidó's interim government does not even have the benefit of relying on the traditional legal framework that governs public entities in Venezuela and would ensure their proper management. Simply put, the traditional processes and mechanisms that exists under Venezuelan law are unreachable by his interim government, which is why Guaidó resorted to exceptional powers. As long as this very unusual situation of two competing governments persists, Guaidó's reliance on a few scant provisions of emergency legislation that calls for transparency, accountability and independence – but is unable to provide it— coupled with his need to use PDVSA's foreign assets as a bargaining chip against Maduro cannot possibly ensure any separateness between PDVSA and Venezuela.

27. Based on the aforementioned, I continue to believe that the circumstances considered by this Court back in 2018 regarding PDVSA's status as Venezuela's alter ego have not only remained in place but become more pronounced as a result of an ongoing tug-of-war between Maduro and Guaidó.

I declare under penalty of perjury that the foregoing is true and correct.

Miami, 16 April 2021.

Manuel A. Gómez

---

[19] Junta Administradora Ad Hoc de PDVSA, "Presentación de Resultados 2019-2020", "*Debido a la dispersión geográfica de sus miembros, y la falta de recursos, las reuniones son virtuales, una vez por semana o de manera extraordinaria cuando la situación así lo amerite – Quorum de cinco de sus miembros (artículo 10, decreto No.3*". (Due to the geographic dispersion of its members, and the lack of resources, the meetings are virtual, oxnce a week or in an extraordinary way when the situation warrants it - Quorum of five of its members (article 10, decree No.3") Available at: http://pdvsa-adhoc.com/en/our-mission/ (Last visited, 16 April 2021).