**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NORTHROP GRUMMAN SHIP SYSTEMS, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> THE MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA, <br><br> *Defendant*. | : <br> : <br> : <br> : C.A. No. 1:20-mc-00257-LPS <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

**RESPONSE OF INTERVENOR PETRÓLEOS DE VENEZUELA, S.A. TO PROPOSED FINDINGS OF FACT OF PLAINTIFF NORTHROP GRUMMAN SHIP SYSTEMS, INC.**

OF COUNSEL:

Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com

November 17, 2022

HEYMAN ENERIO GATTUSO & HIRZEL LLP
Samuel T. Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
SHirzel@hegh.law

*Attorneys for Intervenor*
*Petróleos de Venezuela, S.A.*

Intervenor PDVSA[1] submits this Response to Plaintiff's Proposed Findings of Fact ("HI Proposal") (D.I. 72). PDVSA hereby incorporates by reference the reservation of rights in PDVSA's Proposed Findings of Fact ("PDVSA Proposal") (D.I. 71), including PDVSA's reservations concerning the burden of proof and its immunities under the FSIA. PDVSA objects to certain of Huntington Ingalls' proposed findings of fact on the grounds that, for the most part, they are not statements of fact and are, instead, legal conclusions. Any failure to address any allegations in the HI Proposal shall not be construed as an admission of any such allegations, but only that the allegation is irrelevant to any issue before this Court. Notwithstanding the foregoing, PDVSA responds to HI's Proposal as follows:

1. Huntington Ingalls' allegations concerning the conduct of the illegitimate Maduro regime and its relationship to PDVSA (HI Proposal ¶¶ 7-12) are irrelevant as set forth in: PDVSA Proposal ¶¶ 3-4, 15, 32-33; *see* PDVSA's Response to OIEG's Proposed Findings of Fact ¶¶ 1-3 (19-mc-0290); PDVSA's Response to Rusoro's Proposed Findings of Fact ¶¶ 1-4 (21-mc-481) – which are incorporated herein by reference.

2. It is undisputed that the U.S. Government continues to recognize the Interim Government as the sole and exclusive government of Venezuela. HI Proposal ¶ 11.

3. Huntington Ingalls alleges that the legal framework enacted by the Interim Government, including the Transition Statute, Presidential Decree No. 3 and the resolution passed by the Venezuelan National Assembly in April 2019 (the "April 2019 Resolution" and collectively, the "Regulations"), has increased the Republic's control over PDVSA. HI Proposal ¶ 42. To support that allegation, Huntington Ingalls asserts the following:

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in PDVSA's Proposed Findings of Fact, dated November 10, 2022 [D.I. 71]

      a.      The Transition Statute provides for the Interim Government to exercise the Republic's rights as PDVSA's shareholder to appoint the members of PDVSA's *ad hoc* Board.  HI Proposal ¶ 14.

      b.      The Regulations provide that PDVSA's *ad hoc* Board shall have the power to act as PDVSA's shareholder assembly and its board of directors and suspended all rights and powers of any persons appointed by the Maduro regime to serve as PDVSA's president or members of its board of directors or shareholders assembly.  *Id.*  ¶¶ 14, 31.

      c.      The Regulations suspended all rights and powers that the Ministry of Hydrocarbons had with respect to PDVSA.  *Id.*  ¶ 33.

      d.      The Regulations prohibit PDVSA's *ad hoc* Board and its U.S. Subsidiaries from dealing with or taking instructions from the Maduro regime.  *Id.*  ¶¶ 14, 43.

      e.      The Transition Statute states that it shall prevail over any other applicable rule and shall govern the interpretation of any other formality required by Venezuelan law or corporate documents with respect to the exercise of PDVSA's rights as shareholder of PDVH.  *Id.*  ¶¶ 14, 30, 42-43.

The Regulations are designed to ensure that the Interim Government is able to able to exercise its rights as PDVSA's legitimate shareholder and to prevent the illegitimate Maduro regime from asserting any purported shareholder rights or otherwise interfering with PDVSA's *ad hoc* Board or its U.S. Subsidiaries.  Brewer-Carías Decl. ¶¶ 28-43.  The Regulations also reflect the exercise of ordinary and legitimate regulatory power.  In fact, the U.S. Government has enacted similar regulations through the OFAC sanctions program that prohibit U.S. persons from dealing with the Maduro regime.  Nothing in the Regulations shows that the Interim Government exercises day-to-day control over the operations of PDVSA *ad hoc* Board or the U.S. Subsidiaries.

    4.      Contrary to Huntington Ingalls' assertions, the Regulations show that the Interim Government has taken steps to restore PDVSA's independence from the Republic:

      a.      The Regulations provide for PDVSA's *ad hoc* Board and its U.S. Subsidiaries to operate autonomously and free from political interference from the Interim Government.  Brewer-Carías Decl. ¶¶ 34-35, 40-42.

      b.      The Regulations require PDVSA's *ad hoc* Board and its U.S. Subsidiaries to follow to make their own independent business decisions based on commercial efficiency criteria.  Brewer-Carías Decl. ¶ 35, 40-42.

      c.    While this Court previously found that the prior Chávez and Maduro regimes used Venezuela's Ministry of Hydrocarbons to control PDVSA's operations, *Crystallex Int'l Corp. v. Bolivarian Rep. of Venez. ("Crystallex I")*, 333 F. Supp. 3d 380, 408 (D. Del. 2018), the Regulations have stripped the Ministry of Hydrocarbons of its rights and powers. Brewer-Carías Decl. ¶¶ 37-39.

5.    Huntington Ingalls alleges that the Interim Government failed to comply with corporate formalities by exercising its shareholder rights to appoint the members of PDVSA's *ad hoc* Board. HI Proposal ¶¶ 13-14, 30, 53. But that does not demonstrate any failure to observe corporate formalities or any control over PDVSA's day to day operations. The Interim Government is PDVSA's sole legitimate shareholder and therefore, like any corporate shareholder, it has the right to appoint the corporation's directors. And, contrary to Huntington Ingalls' assertions, the mere fact that the Interim Government has appointed the members of the PDVSA *ad hoc* Board does not demonstrate that the Republic approves PDVSA's ordinary business decisions. *Id.* ¶ 30. Furthermore, it is undisputed that PDVSA's *ad hoc* Board is composed of international petroleum industry professionals and there are no government officials on the *ad hoc* Board, Medina Decl. ¶¶ 5, 11(e); Pacheco Decl. ¶ 12(e). The PDVSA *ad hoc* Board is thus significantly more independent from the Republic than the boards appointed by the prior Chávez and Maduro regimes. *Crystallex I,* 333 F. Supp. 3d at 407.

6.    Huntington Ingalls alleges that the Interim Government has appointed the directors of PDVSA's U.S. Subsidiaries. HI Proposal ¶¶ 14, 53. However, the unrebutted evidence establishes that, since February 2019, PDVSA's *ad hoc* Board has exercised PDVSA's shareholder rights to appoint PDVH's directors, PDVH's directors have, in turn, exercised PDVH's shareholder rights to appoint CITGO Holding's directors, and CITGO Holding's directors have, in turn, exercised CITGO Holding's shareholder rights to appoint CITGO Petroleum's directors. Medina Decl. ¶ 4(d); *Jiménez v. Palacios,* No. 2019-0490-KSJM, 2019 Del. Ch. LEXIS 288, at *13 (Del. Ch. Aug. 2, 2019), *aff'd* 237 A.3d 68 (Del. 2020).

7. Huntington Ingalls asserts that the Interim Government has referred to PDVSA and its U.S. Subsidiaries as Venezuelan assets in informal statements. HI Proposal ¶¶ 18-22, 24, 45. However, such soundbites do not demonstrate any failure to observe corporate formalities or otherwise demonstrate that the Interim Government exercises day-to-day control over PDVSA or its U.S. Subsidiaries. Such soundbites reflect communications to the Venezuelan people who view PDVSA and its direct and indirect U.S. Subsidiaries as important to the Venezuelan oil industry and that any loss of these companies would have an indirect negative impact on the Republic as the ultimate parent. Medina Decl. ¶ 14; Medina Test., Hrg. Tr. 109:6-18.

8. Huntington Ingalls mischaracterizes statements by the former Chairman of PDVSA's *ad hoc* Board, Luis Pacheco, as acknowledging the Interim Government's "total control" over PDVSA and its U.S. Subsidiaries. HI Proposal ¶ 17. The unrebutted evidence demonstrates that Mr. Pacheco stated that the respective boards of directors had assumed control over the management of those companies. Medina Decl. ¶ 8; D.I. 27-17. This statement and other similar soundbites relied on by Huntington Ingalls, when read in context, refer to the Interim Government's taking the Republic's shareholder rights in PDVSA away from the Maduro regime and do not indicate any failure to observe corporate formalities or that the Interim Government controls PDVSA's day-to-day operations. *Id.*

9. Huntington Ingalls alleges that PDVSA is required to obtain approval from the Interim Government for routine contracts and business decisions. HI Proposal ¶¶ 26, 30-35. To the contrary, the unrebutted evidence shows that PDVSA's *ad hoc* Board and its U.S. Subsidiaries operate autonomously and make independent business decisions without any directives from the Interim Government. Medina Decl. ¶¶ 7, 11; Pacheco Decl. ¶¶ 12. Unlike the prior Chávez and Maduro regimes, *Crystallex I,* 333 F. Supp. 3d at 407-10, the Interim Government does not dictate

the terms of PDVSA's commercial transactions or otherwise impose obligations on PDVSA. Medina Decl. ¶¶ 4, 6-7, 11-12; Pacheco ¶ 7, 12.

10. There is no evidence that the Interim Government approves all of PDVSA's contracts or interferes in PDVSA's day-to-day operations. The Venezuelan Constitution does provide for the National Assembly to review and approve a specific category of contracts – i.e. national interest contracts – to ensure that those contracts are consistent with Venezuelan law and in the best interests of the Venezuelan people. National interest contracts can include contracts entered into by PDVSA where such contracts implicate the national public interest. But these Constitutional provisions and related statutes were in place prior to 2003 and were part of the legal framework that existed during the period before 2003 when it is undisputed that PDVSA operated as an autonomous, commercial-minded corporation that was separate and independent from the Republic. Gómez Test., Hrg. Tr. 51:22-53:9; Gómez Report ¶ 10. Furthermore, the unrebutted evidence demonstrates that the National Assembly merely reviews such contracts to ensure that they comply with constitutional and other legal requirements and does not dictate the commercial terms of PDVSA's contracts. Medina Test., Hrg. Tr. 86:14-21, 95:5-16, 114:1-9. The National Assembly's regulatory role in reviewing national public interest contracts does not demonstrate day-to-day control over PDVSA's operations.

11. Huntington Ingalls relies on the fact that PDVSA has commenced a lawsuit (the "Bond Case") to challenge the validity of certain bonds that were issued by PDVSA under the leadership appointed by the Maduro regime. HI Proposal ¶¶ 26, 46-47; D.I. 27-16 at pp. 2, 6. PDVSA argued in the Bond Case that the transaction constituted a national public interest contract and therefore required the approval of the National Assembly because the bonds were secured by a pledge of 50.1% of the shares of CITGO Holding. D.I. 27-16 at pp. 9-10. PDVSA argued that

transaction was void because the National Assembly never approved the transaction, and, in fact, publicly opposed the transaction. *Id.* at pp. 10-12. Through the Bond Case, PDVSA is merely enforcing the legal framework governing national public interest contracts that existed during the period before 2003 when it is undisputed that PDVSA was independent from the Republic. Gómez Test., Hrg. Tr. 51:22-53:9; Gómez Report ¶ 10. The Chávez and Maduro regimes ignored that legal framework, and PDVSA's *ad hoc* Board is trying to address the abuses of those prior regimes and the failure of those prior regimes to comply with corporate and legal formalities. Thus, if anything, the Bond Case shows that PDVSA is seeking to restore compliance with the legal framework that prevailed before the abuses of the Chávez and Maduro regimes. The extraordinary circumstances underlying the Bond Case are in no way related to day-to-day control of PDVSA.

12. Huntington Ingalls alleges that the Interim Government had directed PDVSA's legal strategy in the Bond Case and other matters. HI Proposal ¶¶ 15, 32, 46-47. Huntington Ingalls mischaracterizes a quote attributed to Mr. Pacheco in which he states that the social and political situation in Venezuela made it difficult to negotiate with bondholders and to address the bondholders' efforts to lobby the U.S. Government. D.I. 38-4. Mr. Pacheco does not mention any involvement by the Interim Government in the Bond Case or any other lawsuit. *Id.* While, in the Bond Case, PDVSA has relied on a resolution of the National Assembly, dated September 27, 2016, refusing to approve the pledge of the CITGO Holdings shares and a resolution, dated October 15, 2019, invalidating the bonds, those resolutions do not direct PDVSA to do anything. D.I. 27-16 at pp. 10-12. Furthermore, the unrebutted testimony of the Chairman of PDVSA's *ad hoc* Board, Horatio Medina, states that the Interim Government does not direct PDVSA's legal strategy. Medina Decl. ¶ 18.

13. Huntington Ingalls alleges that PDVSA is required to obtain approval from the Interim Government in order to pay its legal fees. HI Proposal ¶¶ 35-40, 48. While the National Assembly passed a Resolution authorizing PDVSA to use its own funds for the legal defense of PDVSA's assets in the U.S., that Resolution merely served as a regulatory safeguard to combat the sorts of abuses that prevailed during the Chávez and Maduro regimes. Medina ¶ 18. That Resolution does not confer upon the Interim Government any right to direct PDVSA's selection of counsel, legal strategy or the day-to-day payment of legal fees. *Id.* Mr. Medina's unrebutted testimony is that PDVSA retains and pays for its own legal counsel in litigations in the United States. *Id.*

14. Huntington Ingalls asserts that the Interim Government has used PDVSA and CITGO funds to pay the Republic's legal fees. HI Proposal ¶¶ 27, 37-38, 40, 48. Because creditors of the Republic have commenced legal proceedings in the U.S. to attach and execute upon PDVSA's assets to satisfy debts of the Republic, PDVSA's *ad hoc* Board authorized the lending of funds to pay some of the Republic's legal expenses incurred in defending those proceedings and thus protecting PDVSA's assets. The *ad hoc* Board determined that such use of PDVSA funds was appropriate because those funds were spent towards the protection of PDVSA's assets and because there was an agreement that the Republic would repay those funds. Medina Decl. ¶ 17. Such loans do not indicate any failure to observe corporate formalities.

15. Huntington Ingalls alleges that the Interim Government has used PDVSA and CITGO monies to fund the National Assembly. HI Proposal ¶ 27. Huntington Ingalls relies on unsourced and unsubstantiated hearsay accusations in media reports – and those reports acknowledge that the Interim Government denies the accusations. D.I. 48-3. Furthermore, Mr. Medina's unrebutted testimony is that the Interim Government, PDVSA and its U.S. Subsidiaries

have their own separate sources of funding, and that the Interim Government does not draw funds directly from PDVSA or its U.S. Subsidiaries. Medina Decl. ¶ 19.

16. Huntington Ingalls alleges that PDVSA only paid its debts when such payments were approved by the Interim Government and stopped paying its debts at the instruction of the National Assembly. HI Proposal ¶ 44. The evidence cited by Huntington Ingalls solely relates to payments on the bonds at issue in the Bond Case, and does not relate to PDVSA's debts in general. *Id.* Furthermore, Mr. Medina testified that the PDVSA *ad hoc* Board independently decided that PDVSA should make payments on the bonds in May 2019 and, when the National Assembly originally opposed making the payments, PDVSA convinced the National Assembly that the payments had to be made in order for PDVSA to be able to negotiate with the bondholders. Medina Test., Hr. Tr. 96:8-99:24. While the National Assembly issued a resolution in October 2019 declaring the bonds invalid, that resolution does not instruct PDVSA to stop paying the bonds. D.I. 27-16 at pp. 10-12. PDVSA's *ad hoc* Board ultimately brought a lawsuit to invalidate the bonds after negotiations with the bondholders were unsuccessful. *Id.*; D.I. 38-2 at ECF 12. However, as Mr. Medina testified, PDVSA's *ad hoc* Board made its own independent determination with respect to the bond payments and was able to move forward with its decision to make bond payments even where the Interim Government disagreed with that decision. Medina Test., Hr. Tr. 96:8-99:24. Again, the bond payments situation is an extraordinary circumstance that has no bearing on the issue of day-to-day control.

17. Huntington Ingalls relies on the Interim Government's expressed desire for a global restructuring of Venezuela's and PDVSA's debts as evidence that the Interim Government does not distinguish between the assets and liabilities of PDVSA and those of the Republic. HI Proposal ¶ 25. Those statements say nothing about how such a restructuring will be accomplished but only

that eligible claims shall have a right to "renegotiation on equal terms" and that "no different treatment shall be accorded" to eligible claims based on the origin of the claim, the domicile of the claimholder or the identity of the public sector obligor. D.I. 27-13 at ECF 3. Furthermore, Mr. Medina's unrebutted testimony is that the desire for an orderly global restructuring stems from the reality that creditors of the Republic, such as Huntington Ingalls, are seeking to blur the lines between PDVSA and the Republic by seeking to attach PDVSA's assets to satisfy the Republic's obligations. Medina Decl. ¶ 15. In any event, no such restructuring has occurred.

18. Huntington Ingalls alleges that the National Assembly resolution declaring invalid the Maduro regime's sale of PDVSA's stake in a Swedish refinery, Nynas AB, is evidence that the Interim Government does not distinguish between PDVSA's assets and those of the Republic. HI Proposal ¶ 41. The Nynas transaction was done by the Maduro regime and did not involve the *ad hoc* Board. The National Assembly was merely exercising its regulatory function of reviewing a national public interest contract. *See supra* ¶¶ 10-11. It is hardly surprising that the Interim Government would exercise its rights as both the legitimate shareholder of PDVSA and the legitimate regulatory authority to object to the illegitimate Maduro regime's looting of PDVSA's assets.

19. While Huntington Ingalls asserts that the OFAC sanctions define "Government of Venezuela" to include PDVSA, those sanctions do not demonstrate that the U.S. Government views the Interim Government and PDVSA as one and the same. HI Proposal ¶ 23. To the contrary, OFAC recognized the distinction between the Republic and PDVSA by blocking the assets of PDVSA and the Republic under separate executive orders issued at different times. *See* Exec. Order No. 13884, 84 Fed. Reg. 38843 (Aug. 5, 2019); Exec. Order No. 13850, 83 Fed. Reg. 55243 (Nov. 1, 2018). The OFAC sanctions are designed to target the Maduro regime and have no

bearing on the relationship between PDVSA and the Interim Government. Furthermore, the U.S. Government has expressly stated that it does not believe that an alter ego relationship exists in light of the changes made by the Interim Government. Meehan Decl., Ex. 8, at 8

20. Huntington Ingalls alleges that the Interim Government has "leveraged CITGO as a political asset" simply because members of the National Assembly and PDVSA's *ad hoc* Board participated in panel discussions on the future of the Venezuelan oil industry. HI Proposal ¶ 28. That event was hosted by CWC Group, a private entity, and included panelists from the U.S. Government, private companies, law firms and universities. D.I. 38-6. There is nothing about that event that even suggests that CITGO was "leveraged" in any way or that the Interim Government forced anyone to participate.

|  |  |
|---|---|
| | HEYMAN ENERIO GATTUSO & HIRZEL LLP |
| | */s/ Samuel T. Hirzel, II* |
| OF COUNSEL: | Samuel T. Hirzel, II (#4415) |
| | 300 Delaware Avenue, Suite 200 |
| Joseph D. Pizzurro | Wilmington, DE 19801 |
| Kevin A. Meehan | (302) 472-7300 |
| Juan O. Perla | SHirzel@hegh.law |
| CURTIS, MALLET-PREVOST, | |
| COLT & MOSLE LLP | *Attorneys for Intervenor* |
| 101 Park Avenue | *Petróleos de Venezuela, S.A.* |
| New York, NY 10178 | |
| (212) 696-6000 | |
| jpizzurro@curtis.com | |
| kmeehan@curtis.com | |
| jperla@curtis.com | |

Dated: November 17, 2022